UNITED STATES DISTRICT COURT                              O
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

RAMIRO GONZALEZ *et al*          §
                                 §
    **Plaintiffs**          §
VS.                              §          CIVIL ACTION NO. L-08-24
                                 §
UNITED STATES OF AMERICA         §

<u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendant Alvin Vega's ("Vega") Motion for Summary Judgment. [Dkt. No. 29].[1]  After duly considering the summary judgment motion, response, and applicable law, Defendant's motion for summary judgment is **GRANTED**, in part, and **DENIED**, in part.

I.       BACKGROUND

    A.       Relevant Facts

On March 8, 2006, U.S. Border Patrol Agent Alvin Vega patrolled an area that included Masterson Road, a road which runs from the banks of the Rio Grande River to the Zapata Highway in Laredo, Texas. [Dkt. No. 29, Ex. A at 119, 124, 154].  Vega had served as a border patrol agent for approximately eight (8) years, working almost entirely in Laredo, and during such time conducted hundreds of vehicle stops for immigration inspection purposes. [Dkt. No. 29, Ex. A at 17, 22, 59].  Masterson Road is located in an area known for drug and alien smuggling. [Dkt. No. 29, Ex. C at 38].  During the previous month, nearly 1000 apprehensions occurred in the area. [Dkt. No. 29, Ex. A at 142].  According to Vega, he previously observed people walk from the riverbank of the Rio Grande, enter vehicles, and flee the area. [*Id*. at 213-

---

[1] "Dkt. No." refers to the docket number entry in the Court's electronic filing system. The Court will cite to the docket number entries rather than the title of each filing.

214].   The vehicles would then carry passengers east on Masterson Road towards the Zapata Highway.  [*Id*. at 214].

During his patrol on March 8, 2006, Vega received notice from Border Patrol Radio Dispatch that a seismic sensor was triggered on Masterson Road.   [*Id*. at 122].   Thereafter, in no more than two minutes, Vega responded by traveling to the intersection of Masterson Road and Neches.   [*Id*. at 127, 131].   While waiting at this intersection, Vega observed a blue sedan coming from the end of Masterson Road.   [*Id*. at 128].   The sedan, a Grand Marquis, was driven by Plaintiff Rolando Gonzalez; his mother, Plaintiff Paula Gonzalez, was the front-seat passenger.  [Dkt. No. 30, Ex. 2, ¶ 2].   Vega observed that Rolando Gonzalez "didn't slow down at the corner and kept going east."   [*Id*. at 134].   Additionally, Vega observed that Rolando Gonzalez "didn't even look at [him]."   [*Id*.].   Vega also noted that Plaintiffs' Grand Marquis was a large sedan.  [*Id*. at 137].   The vehicle was also very dusty.  [*Id*.].   Specifically, Vega noted that the car had a "white-looking powder" that is usually seen close to riverbanks.  [*Id*. at 216].   The vehicle was also "traveling low in the rear."   [*Id*. at 215-216].   On the other hand, through his affidavit, Rolando Gonzalez states that he was driving at a regular rate of speed down Masterson Road.  [Dkt. No. 30, Ex. 2, ¶ 2].

Thereafter, Vega followed Plaintiffs' Grand Marquis and drove close to the vehicle in an attempt to look inside.   [*Id*. at 138].   Vega attempted to look inside the rear passenger compartment.  [*Id*. at 138].   As he moved closer, he could hear the driver and passenger yelling obscenities at him.  [*Id*. at 140].   Vega testified that he followed Plaintiffs for less than a minute. [*Id*.].   Vega next decided to stop Plaintiffs' vehicle before Plaintiff could reach the Zapata Highway, [*Id*. at 154], and proceeded to put on his lights and siren.   [*Id*.].   Immediately thereafter, Plaintiffs' vehicle stopped on the side of the street.  [*Id*. at 157].   Vega then parked on

the side of Plaintiffs' vehicle.  [*Id*. at 158].  Vega's purpose in pulling Plaintiffs' vehicle over was "[t]o make an immigration inspection on the passengers of the vehicle and the driver."  [*Id*. at 156].

According to Vega, Rolando Gonzalez stepped outside of the Grand Marquis before Vega stepped out of his vehicle.  [*Id*. at 158].  Vega testified that after he stepped out of his vehicle, Paula Gonzalez stepped out of the Grand Marquis on the passenger side.  [*Id*.].  Vega then told Rolando Gonzalez to get back into his vehicle and also questioned Rolando Gonzalez as to his citizenship, specifically asking Rolando Gonzalez where he was from.  [*Id*. at 159].  Rolando Gonzalez responded by stating "Yes, I'm a U.S. citizen."  [*Id*. at 160].  Rolando Gonzalez did not get back into his vehicle, thus Vega asked him to get back into his vehicle a second time.  [*Id*.].  After Rolando Gonzalez refused to comply, Vega asked whether someone else was in the car and whether Rolando Gonzalez had something in the trunk of his vehicle.  [*Id*. at 160].  While Vega asked Rolando Gonzalez these questions, Paula Gonzalez allegedly shouted profanities at Vega.  [*Id*.].  Next, without being prompted by Vega to do so, Rolando Gonzalez opened the trunk of his car and said, "You see?  There's nothing there."  [*Id*. at 162].  At this point, Paula Gonzalez approached Vega and Vega told her to go back.  [*Id*.].

During the stop, Vega was not satisfied that there was nothing in the trunk.  [*Id*. at 164].  Specifically, Vega stated that he "couldn't see a hundred percent inside the trunk," and that his attention was focused on Plaintiff driver and Plaintiff passenger.  [*Id*.].  Vega stated that Plaintiffs commanded his full attention because they were agitated and it appeared to Vega that Plaintiff Rolando Gonzalez wanted to harm him.  [*Id*. at 166].

After showing Vega the inside of the vehicle's trunk, Rolando Gonzalez allegedly continued directing profanities towards Vega and then stated, "[y]ou know what?  I'm taking

off."  [*Id*. at 162, 171].  Vega then told Plaintiff driver, "[d]on't take off cause I haven't finished my immigration inspection.  I want to talk to the lady."  [*Id*. at 167].  Vega stated that he intended to ask her about her status.  [*Id*. at 168].  Thereafter, Vega testified that Rolando Gonzalez stated "[t]he h--- with you," got back into his vehicle, and drove away.  [*Id*. at 171].  Rolando Gonzalez then made a u-turn on Masterson Road and headed west.  Rolando Gonzalez parked the Grand Marquis in front of his family's home on Masterson Road, Laredo, Texas, and thereafter told his father, Ramiro Gonzalez, that Vega followed them.  [Dkt. No. 30, Ex. 1, ¶ 3].

Plaintiffs dispute Vega's account of the forgoing events which led to Rolando Gonzalez's decision to leave the scene of the initial stop.  Rolando Gonzalez alleges that Vega pulled up parallel to his vehicle, once it was stopped, and asked a question that was inaudible to Rolando Gonzalez because his window was not working.  [Dkt. No. 30, Ex. 2, ¶ 3].  When Rolando Gonzalez necessarily opened his door, he asked Vega, "[w]hat's going on sir?  Is there a problem?"  [*Id*.].  In response, Vega stated, "it's because you're loaded to the max with 'wet backs.'"  [*Id*., ¶ 4].  When Rolando Gonzalez asked Vega how that could be, Vega responded that he had received anonymous calls.  [*Id*.].  Rolando Gonzalez further asserts that, at no point during the stop, did Vega ask Rolando Gonzalez or Paula Gonzalez whether they were U.S. citizens or what their immigration status was.  [Dkt. No. 30, Ex. 2, ¶ 8].

Plaintiffs also dispute the manner in which Vega was shown the contents of the trunk.  According to Rolando Gonzalez, Vega allegedly got out of his vehicle and ordered Rolando Gonzalez to open his trunk.  [*Id*., ¶ 5].  Instead, Rolando Gonzalez pulled his identification from his wallet and offered it to Vega.  [*Id*.].  Vega allegedly stated, in Spanish, "[w]hy are you taking it out?  I didn't tell you to take it out!"  [*Id*.].  Vega then allegedly told Rolando Gonzalez that he and Paula Gonzalez were arrested.  [*Id*.].  After Rolando Gonzalez's initial refusal to open the

trunk, Vega allegedly showed Rolando Gonzalez "a paper showing [] that they had proof [Plaintiffs] were carrying undocumented aliens."  [*Id.*, ¶ 6].  During this time, Rolando Gonzalez states that Vega repeatedly grabbed his gun which remained in his holster.  [*Id.*].  Thereafter, Rolando Gonzalez consented to the search of the trunk.  [*Id.*, ¶ 7].  Rolando Gonzalez states that Vega "looked inside the trunk, but he found neither undocumented aliens nor contraband."  [*Id.*].  Vega denies telling Plaintiffs that he received a tip or that he said anything which would indicate a belief that he received a tip that Plaintiffs were carrying contraband or aliens.  [*Id.* at 162].  It is undisputed that Vega never asked Paula Gonzalez about her citizenship.  [Dkt. No. 29, Ex. A at 167].  It is also undisputed that Plaintiffs left the scene before being dismissed and despite Vegas's request to the contrary.

Vega testified that he did not pursue Plaintiffs when they left the scene but rather, he contacted Border Patrol Dispatch for backup.  [*Id.* at 174, 176, 178].  Thereafter, Vega traveled west on Masterson Road, having seen Plaintiffs head in that direction.  [*Id.* at 179-180].  Vega subsequently located Plaintiffs' vehicle at their home on Masterson Road and parked more than two houses away from the car.  [*Id.* at 181].  After parking, Vega waited for backup to arrive.  [*Id.*].

Initially, two border patrol agents, Anaisar Garza and Nathan Trejo, responded to Vega's call for backup.  [Dkt. No. 29, Ex. D at 19; Ex. E at 23-25].  While traveling to Vega's location, Agent Garza requested the assistance of Webb County Deputy Sheriff Luciano Castro, who then followed Agent Garza to Vega's location.  [Dkt. No. 29, Ex. D at 14].

Once the other agents arrived, Vega climbed out of his vehicle but remained by the vehicle.  He was then approached by members of Rolando Gonzalez's family.  [Dkt. No. 29, Ex. A at 181, 184].  According to Vega, "the father" approached him first.  [*Id.* at 185].  As the

family approached, Vega asked them, "[w]here's the lady?"  [*Id*. at 184].  After the family approached him, Vega testified that "[t]hey almost hit me."  [*Id*. 184].  According to Agent Garza, he saw "a lot of people out, basically charging towards him."  [Dkt. No. 29, Ex. D at 19].  Garza also stated that males and a female were yelling, pointing, and charging at Vega, and also that some surrounded Vega's vehicle.  [*Id*. at 23].  After Garza exited his vehicle, he positioned himself between Vega and the individuals who were coming towards Vega.  [*Id*. at 24].  He asked the individuals to step back.  [*Id*. at 25].  Garza testified that Deputy Castro was next to him and also tried to control some of the individuals.  [*Id*. at 33].  During this time, Agent Garza testified that he did not shout, but that "[t]hey were yelling and cursing" and that several of the male individuals "kept on coming forward in a threatening manner."  [*Id*. at 26].  Agent Garza believed that Rolando Gonzalez and his brothers approached Vega, said something in Spanish, then walked off.  [*Id*. at 28].  During this time, Agent Garza testified that "they" did not touch him and that he never touched "them."  [*Id*. at 29].  Agent Garza also testified that Ramiro Gonzalez threatened Vega in Spanish with physical harm.  [*Id*. at 27].  Additionally, when Agent Trejo arrived, he positioned himself to one side where there were no law enforcement agents. [Dkt. No. 29, Ex. E at 40].  Agent Trejo observed  Ramiro Gonzalez shouting and gesturing at Vega.  [*Id*. at 42].  Agent Trejo also observed Ramiro Gonzalez tell Vega a Spanish phrase that Agent Trejo interpreted to mean, "I'm going to f--- you up."  [*Id*. at 42, 49].  At some point, Agent Trejo observed Deputy Castro instruct Ramiro Gonzalez to calm down.  [*Id*. at 50.].  Thereafter, Laredo Police Department Officers arrived.  [Dkt. No. 29, Ex. D at 42].  According to Agent Garza, the individuals returned to their home and refused to come out.  [*Id*.].

Plaintiffs dispute the course of events that occurred after Vega parked near Plaintiffs' residence.  Specifically, Ramiro Gonzalez alleges that, after Rolando Gonzalez explained that

Vega followed him home, he noticed Vega's vehicle and walked over to ask Vega why he arrived. [Dkt. No. 30, Ex. 1, ¶ 3, 4]. Ramiro Gonzalez asserts that he did not threaten Vega at any time during the time he talked with him. [*Id*., ¶ 8]. Ramiro Gonzalez alleges that he repeatedly asked Vega why he was being arrested and that Vega never responded. [*Id*. at ¶ 5]. Moreover, Ramiro Gonzalez avers that he was told that he was under arrest. Specifically, Ramiro Gonzalez asserts that "[b]oth Agent Vega and the Deputy Sheriff told us that we were all arrested." [*Id*., ¶ 8]. During the course of the conversation, nearly the entirety of which was conducted in Spanish, Ramiro Gonzalez states that he was told in Spanish, "[s]hut up because it's going to go bad for you. We're going to arrest you." [*Id*. at ¶ 6]. At some time during the conversation, Ramiro Gonzalez asserts that Vega talked with a Deputy Sheriff, and that, thereafter, the Deputy Sheriff told him that he was being arrested. [*Id*. at ¶ 7]. According to Ramiro Gonzalez, the Deputy Sheriff attempted to grab his arm but ceased after Ramiro Gonzalez said that his arm was injured and one of his sons pleaded that Ramiro Gonzalez not be handcuffed. [*Id*.]. But Ramiro Gonzalez concedes that while the Deputy Sheriff did not put handcuffs on him, officers "continued to say that [they] were arrested." [*Id*.]. Through his declaration, Rolando Gonzalez also stated that, "[w]e were all told more than once by [Vega] and the Deputy Sheriff that we were all under arrest, not to move." [Dkt. No. 30, Ex. 2, ¶ 10]. According to Rolando Gonzalez, two investigators from the Sheriff's office advised them to move onto their property. [*Id*.].

According to Vega, approximately half an hour transpired from the time he arrived at the scene to the end of the incident. [Dkt. No. 29, Ex. A at 196]. Vega testified that he never told Plaintiffs that they were not free to leave because they were under arrest. [*Id*. at 195]. Vega specifically asserts that he never personally attempted to arrest Ramiro Gonzalez. [*Id*. at 192-

193].   But Vega testified that he told Deputy Castro and a sergeant from the police that he wanted to press charges for "terroristic threats" made against him.  [*Id*.].  Furthermore, according to Vega, Deputy Castro did not attempt to put handcuffs on Ramiro Gonzalez.   [*Id*. at 194].  Nonetheless, Agent Garza testified that Vega told Ramiro Gonzalez that the FBI could arrest him for threatening a federal agent.  [Dkt. No. 29, Ex. D at 47].  Agent Garza also testified that he did not see any officers attempt to physically take Plaintiffs into custody.  [*Id*. at 45].  Agent Garza testified that, during the incident, Plaintiffs moved freely between their home and back outside. [*Id*. at 36].  Subsequent to these events, neither Ramiro Gonzalez nor any of his family members were charged with any crime.  [Dkt. No. 30, Ex. 1 at 10].

### B.      Procedural History

On August 5, 2008, Plaintiffs Ramiro Gonzalez, Rolando Gonzalez, Paula Gonzalez, for herself and as next friend of R.J.G., Raul Gonzalez, and Ricardo Roberto Gonzalez filed their First Amended Complaint against Defendant Vega and the United States, alleging Fourth Amendment claims and various claims under the Federal Tort Claims Act; including assault, battery, intentional infliction of emotional distress, false imprisonment, and, finally, negligence. [Dkt. No. 16 at 7-13].  Two claims were filed against Vega in his individual capacity: first, for unreasonable search and seizure as to Plaintiffs Rolando Gonzalez and Paula Gonzalez, and, second, for unreasonable seizure as to Plaintiff Ramiro Gonzalez.  [*Id*. at 7, 8].  On September 2, 2008, Vega filed an Answer to Plaintiffs' First Amended Complaint, asserting, in part, that Vega is entitled to the affirmative defense of qualified immunity regarding constitutional claims.  [Dkt. No. 19 at 13].  Thereafter, on April 8, 2009, Vega filed a Motion for Summary Judgment, asserting that Plaintiffs Rolando, Paula, and Ramiro Gonzalez have failed to demonstrate that Vega violated their constitutional rights and that, consequently, he is entitled to qualified

immunity.  [Dkt. No. 29].[2]  Plaintiffs then filed a Response to Vega's Motion for Summary Judgment, asserting that Vega is not entitled to qualified immunity because material fact issues exist as to whether Vega had reasonable suspicion to conduct the initial investigatory stop of Plaintiffs' vehicle; whether Vega seized Plaintiffs at their home; and whether Vega had probable cause to seize Plaintiffs.  [Dkt. No. 30].

## II.   DISCUSSION

### A.     Standard Governing Summary Judgment

Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All facts and evidence must be taken in the light most favorable to the non-moving party.  *United Fire & Cas. Co. v. Hixson Bros. Inc.*, 453 F.3d 283, 285 (5th Cir. 2006).

The evidentiary standard for summary judgment motions is provided by Federal Rule of Civil Procedure 56(e). The rule states in part:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit.

FED. R. CIV. P. 56(e)(1).  Moreover, in responding to a properly supported motion for summary judgment, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must-by affidavits or as otherwise provided in this rule-set out specific facts

---

[2] In support of his Motion for Summary Judgment, Vega has provided two transcripts of taped statements.  [*See* Dkt. No. 30, Ex. B & Ex. F].  However, because these transcripts are not properly certified or otherwise authenticated, the Court finds that these transcripts are not admissible summary judgment evidence.

showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). If a party does not so respond, summary judgment should be entered. *See id.*

### B. *Bivens* Actions Generally

Plaintiffs seek damages against Vega under the authority of *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971). In *Bivens*, the Supreme Court recognized a monetary remedy against federal agents who commit constitutional violations.   Generally speaking, "a *Bivens* action is the federal analog" to suits brought against state officials pursuant to 42 U.S.C. § 1983. *Hartman v. Moore*, 547 U.S. 250, 254 n.2 (2006).

A federal official may only be sued in a *Bivens* action in his individual capacity. *Enplanar, Inc. v. Marsh*, 11 F.3d 1284, 1294 n.12 (5th Cir. 1994).   Additionally, the United States does not have vicarious liability for constitutional torts committed by its officials because the United States has not waived sovereign immunity for such actions.  *Brown v. United States*, 653 F.2d 196, 199 (5th Cir. 1981).

### C.   Standard Governing Qualified Immunity

A federal official sued in his individual capacity may raise the affirmative defense of qualified immunity.  *See Petta v. Rivera*, 143 F.3d 895, 898 (5th Cir. 1998).  This doctrine shields the official as "an immunity from suit rather than a mere defense to liability[.]"  *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). This doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To evaluate immunity, a court must ask whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Saucier*, 533 U.S. at 201.  The burden is on the plaintiff to demonstrate

that the official violated a constitutional right. *Thompson v. Upshur*, 245 F.3d 447, 456 (5th Cir. 2001). If the plaintiff shows this, a court then asks whether the right was clearly established.[3] *Saucier*, 533 U.S. at 201. Stated differently, the court must answer whether a reasonable defendant would have clearly known that his conduct was unlawful in the situation he confronted. *Id.* (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

If the plaintiff establishes a violation of a clearly established constitutional right, a court must next determine whether the official's alleged conduct was objectively reasonable at the time of the incident. *See Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001). If the plaintiff has failed to show either that a constitutional violation occurred or that the right was clearly established at the time, this inquiry is pretermitted. *Nunez v. Simms*, 341 F.3d 385, 392 (5th Cir. 2003). "The defendant's acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known" that the conduct violated a constitutional right. *Thompson*, 245 F.3d at 457 (emphasis in original). The "defendant's circumstances" include facts known to the defendant at the time, *id.*, and the particulars of the challenged conduct, *Pierce v. Smith*, 117 F.3d 866, 872 (5th Cir. 1997). The defendant's subjective state of mind does not affect whether he is entitled to qualified immunity. *Id.* at 871 n.5. If defendants of "reasonable competence" might disagree, "immunity should be recognized." *Malley*, 475 U.S. at 341 (1986).

In this case, Plaintiffs assert that, in determining whether Vega violated a constitutional right, the Court must take the facts alleged in the amended complaint as true. [*See* Dkt. No. 30 at 6]. Plaintiffs' understanding of their burden on summary judgment is misguided, however. In the Fifth Circuit, courts look to summary judgment evidence proffered by the parties in

---

[3] Although it is appropriate in this case to consider these two questions in this sequence, such is no longer mandated. *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

conducting the two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity.  *See Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007) ("First, we determine whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights.") (citation omitted); *see also Johnson v. Deep East Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) ("In ruling on a motion for summary judgment based on qualified immunity, the court first determines whether there is evidence to sustain a finding that the defendant's complained of conduct violated plaintiff's constitutional rights.")  Consequently, the Court will only consider admissible summary judgment evidence in determining whether Vega violated Plaintiffs' constitutional rights.

### D.      Whether Vega had Reasonable Suspicion to Conduct a Roving Stop

"[T]he Fourth Amendment applies to all seizures of the person, including seizures involving only a brief detention short of traditional arrest."  *United States v. Nichols*, 142 F.3d 857, 860 (5th Cir. 1998) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)). "Border patrol 'officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country.'"  *United States v. Orozco*, 191 F.3d 578, 581 (5th Cir. 1999) (citing *Brignoni-Ponce*, 422 U.S. at 884)).  A stop without reasonable suspicion violates the Fourth Amendment.  In the Fifth Circuit, eight factors are commonly referred to when determining whether an agent had reasonable suspicion to stop a vehicle, including: (1) proximity of the area to the border; (2) known characteristics of the area; (3) usual traffic patterns on that road; (4) the agent's previous experience in detecting illegal activity; (5) information about recent illegal trafficking in aliens or narcotics in the area; (6)

particular aspects or characteristics of the vehicle; (7) behavior of the driver; and (8) the number, appearance, and behavior of the passengers. *Orozco*, 191 F.3d at 581 (citing *United States v. Samaguey*, 180 F.3d 195, 198 (5th Cir. 1999)).

Importantly, "[r]easonable suspicion determinations are not limited to analysis of any one factor." *Nichols*, 142 F.3d at 866 (citing *United States v. Inocencio*, 40 F.3d 716, 722 (5th Cir. 1994)). Rather, "[i]n making a determination of reasonable suspicion, the agents (and the courts reviewing the agents' actions) must take the totality of the circumstances into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981). "[U]nder a totality of the circumstances analysis, the absence of a particular factor will not control a court's conclusions." *United States v. Cardona*, 955 F.2d 976, 980 (5th Cir. 1992) (citation omitted).

Here, Plaintiffs assert that Vega did not have reasonable suspicion to conduct a roving stop of Plaintiffs' vehicle. On the other hand, Vega contends that, under the pertinent standard announced by the Supreme Court in *Brignoni-Ponce*, Vega had reasonable suspicion to stop the vehicle. The Court agrees with Vega as to this issue—viewing the facts alleged in the light most favorable to Plaintiffs, the totality of circumstances gave rise to a reasonable suspicion to conduct an investigatory stop.

The thrust of Plaintiffs' argument appears to be motivated by Vega's deposition testimony that, while following Plaintiffs' Grand Marquis and having observed Plaintiffs shouting obscenities at him, he continued looking for additional facts. In pertinent part, Vega stated as follows during his deposition: "Q: So at that point, you had not yet made a decision to stop it? A: No. Like I say, I'm looking for articulable facts. Maybe I'd see people or something." [Dkt. No. 29, Ex. A at 138]. After acknowledging, during his deposition, that he had established that the vehicle was dusty and was of the sort used for smuggling, Vega

continued:  "[I] wanted more.  I wanted to see if I could see inside the vehicle.  Maybe I'll see heads.  Sometimes you see people, like I said, hiding behind the passenger."  [*Id*.].   However, Plaintiffs have provided the Court with no authority requiring that an officer view persons suspected of being illegal immigrants inside a vehicle in order to conduct a roving stop. Furthermore, that Vega continued looking for articulable facts to support a roving stop does not necessarily preclude the case that he already observed facts sufficient to create a reasonable suspicion.  Indeed, the summary judgment evidence demonstrates that Vega had reasonable suspicion to conduct a roving stop.

     The characteristics of the area, the road, the vehicle, recent smuggling activity in the area, and Vega's previous experience as a border patrol agent support a finding of reasonable suspicion.  Before stopping Plaintiffs on Masterson Road, Vega noted several characteristics of the Plaintiffs' Grand Marquis that, when viewed in the aggregate of all circumstances, support a finding of reasonable suspicion.  Vega testified that the Grand Marquis fit the profile for older vehicles that were used to transport immigrants because of the vehicle's large size.  [*Id*. at 137]. Specifically, Vega testified that he had reasonable suspicion because, as an older sedan, the Grand Marquis could fit a lot of people.  [*Id*. at 137].  Additionally, the vehicle was covered in dust.  [*Id*. at 133].  Indeed, Vega noted that the vehicle had a "white-looking powder" that is usually seen close to the riverbanks.  [*Id*. at 216].   Finally, Vega testified that the vehicle appeared to be riding low in the rear and thus appeared to be heavily loaded.  [*Id*. at 215-16]. Furthermore, Vega has provided evidence showing that, recently, there had been significant illegal immigration activity in the area.  [*Id*. at 137].  Vega directs the Court to the deposition testimony of Juan Manuel Pina, who testified that, in all of his years of experience, Masterson Road has been a "hot spot" for drugs and aliens.  [Dkt. No. 29, Ex. C at 138].  Additionally,

Vega testified as to the number of apprehensions:  "And based on the amount of apprehensions, close to a thousand people in the month before, less than two months, if I recall.  We have over a thousand apprehensions in that area."  [Dkt. No. 29, Ex. A at 142].  Additionally, Vega testified that he previously observed people walking out of the riverbank, climb into a vehicle, and head east on Masterson towards the highway.  [*Id*. at 213-214].  Finally, as stated, Vega had worked as a border patrol agent for nearly eight (8) years, having served almost entirely in Laredo, and conducted hundreds of vehicle stops for immigration inspection purposes.  [*Id*. at 17, 22, 59].

Furthermore, Vega's testimony indicates that he viewed Plaintiffs' blue Grand Marquis driving eastbound, away from the riverbanks of the Rio Grande,[4] only minutes after he received notice of seismic activity.  This evidence also supports a finding of reasonable suspicion.  As provided by his deposition testimony, Vega responded to notice of seismic activity by waiting at the corner of Masterson and Neches roads.  [Dkt. No. 29, Ex. A at 131].  Minutes after receiving notice of the seismic activity, Vega saw Plaintiffs drive by the intersection in a Grand Marquis.  [*Id*.].  Specifically, in no more than two minutes, Vega reached the intersection of Masterson and Neches.  [*Id*.].  Vega testified that, seconds after arriving, he saw the blue Grand Marquis emerge from Masterson.  [*Id*.].  This evidence tends to support a reasonable inference that Plaintiffs' vehicle was being used for criminal activity.

Plaintiffs' behavior prior to the investigatory stop also supports a finding of reasonable suspicion.  As stated, border patrol agents may consider the behavior of the vehicle's driver in determining whether there is reasonable suspicion to stop a vehicle.  *Nichols*, 142 F.3d at 868 (citing *Brignoni-Ponce*, 422 U.S. at 885)).  Here, as Plaintiffs drove past the intersection of Masterson and Neches where Vega was parked, Vega testified that the Plaintiff driver did not look at him: "And when they got to the intersection, people usually look at you, and if they're

---

[4] The Rio Grande, of course, serves as the border between Mexico and the United States.

local, they're very friendly and they wave." [Dkt. No. 29, Ex. A at 137-138]. Based on this alleged fact, Vega believed that Plaintiffs were not local. [*Id*. at 138]. However, standing alone, the failure of Plaintiffs to make eye contact bears little support for reasonable suspicion. Indeed, in the Fifth Circuit, it is well established that the "[a]voidance of eye contact is entitled to no weight." *Nichols*, 142 F.3d at 868 (citing *United States v. Chavez-Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993)). Nevertheless, Plaintiff Rolando Gonzalez exhibited other driving behavior supporting a finding of reasonable suspicion. Specifically, Vega testified that Plaintiffs "only went real fast when it to (sic) the corner between Neches and Masterson. Then, after that, it was regular speed." [Dkt. No. 29, Ex. A. at 154]. Further, as Vega approached the Grand Marquis, he could hear Plaintiffs yelling obscenities at him. [*Id*. at 138, 140-41, 151-52, 154]. While Rolando Gonzalez stated, through his deposition, that he drove down Masterson Road "at a regular rate of speed," [Dkt. No. 30, Ex. 2 at ¶ 2], he has failed to state whether he traveled at a regular rate of speed at all times. More importantly, however, as Vega approached Plaintiffs' vehicle, he observed Plaintiffs shouting obscenities at him. [Dkt. No. 29, Ex. A at 140]. Plaintiffs have provided no evidence disputing this testimony.

Finally, in further support of their assertion, Plaintiffs contend that, in isolation, none of the factors cited by Vega support a finding of reasonable suspicion. As stated, however, all factors cited by Vega must be considered together in determining whether an officer has reasonable suspicion—the absence of one factor is not dispositive. *Cardona*, 955 F.2d at 980. The summary judgment evidence now before the Court shows that Vega observed Plaintiffs driving east on Masterson Road minutes after receiving notice of seismic activity near the Rio Grande riverbanks; that Plaintiffs' vehicle had dust characteristic of that found near the river; that the vehicle was "riding low;" that the vehicle was a large sedan similar to those customarily

used by smugglers; that Plaintiffs shouted obscenities at Vega as he approached; and that Vega had eight (8) years of experience as a border patrol agent and had conducted various investigatory stops. Viewing all factors in aggregate, the Court finds that a totality of the circumstances created reasonable suspicion for Vega to conduct an investigatory stop. Vega therefore did not violate Rolando or Paula Gonzalez's constitutional rights when he conducted a roving stop of the vehicle.

### E.    Standard Governing Unconstitutional Seizures

It is well established that "[n]ot all encounters between law enforcement officers and citizens are seizures for purposes of the Fourth Amendment." *United States v. Mask*, 330 F.3d 330, 336 (5th Cir. 2003) (*Terry v. Ohio*, 392 U.S. 1, 19 (1968)). "A person is 'seized' under the Fourth Amendment 'only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Gates v. Texas Dep't of Protective and Regulatory Servs.*, 537 F.3d 404, 431 (5th Cir. 2008) (citing *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)). "A voluntary encounter between an officer and citizen may ripen into a seizure, triggering the Fourth Amendment and requiring officers to be able to articulate reasonable suspicion or probable cause, 'only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of [the] citizen.'" *Mask*, 330 F.3d at 336 (citing *Terry*, 392 U.S. at 12)). The pertinent "reasonable person" standard is objective, and, thus not concerned with the citizen's subjective perception or the officers' subjective intent, but only with what the officers' words and actions would have conveyed to a reasonable and innocent person. *Mask*, 330 F.3d at 336 (citing *Chesternut*, 486 U.S. at 574, 576 n.7).

The Fifth Circuit recognizes that, "under the Fourth Amendment[,] a warrantless arrest must be based on probable cause." *United States v. Castro*, 166 F.3d 728, 733 (5th Cir. 1999) (citation omitted). "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect has committed, or was in the process of committing, an offense." *Id*. Consequently, "[a] warrantless arrest violates a suspect's Fourth . . . Amendment rights if the arresting officer lacks probable cause to believe that the suspect has committed a crime." *Bodzin v. City of Dallas*, 768 F.2d 722, 724 (5th Cir. 1985) (citation omitted).

**1.    Whether Vega concluded his immigration inspection before Rolando and Paula Gonzalez left the scene of the initial stop**

In this case, Plaintiffs assert that the evidence supports a conclusion that several specific points in time existed when Vega's actions violated Plaintiffs' Fourth Amendment rights. [Dkt. No. 30 at 9]. As stated, Vega has provided evidence sufficient to show that he had reasonable suspicion to conduct a roving stop of Plaintiffs' vehicle. But aside from this issue, Plaintiffs contend that, following the stop, Vega searched the trunk of Plaintiffs' vehicle without valid consent or probable cause and subsequently pursued Plaintiffs Rolando and Paula Gonzalez to their home without probable cause. On the other hand, Vega contends that the summary judgment evidence reflects that none of the Plaintiffs were ever seized or arrested, and that Rolando voluntarily opened the truck. The parties do not dispute that Rolando and Paula Gonzalez drove away from the scene of the investigatory stop after Vega ordered them not to leave. The Court must therefore determine whether Vega searched Plaintiffs' trunk without valid consent or probable cause. The Court also must determine whether Vega seized Rolando, Paula, and Ramiro Gonzalez, and if so, whether Vega had probable cause to do so.

"[W]hen an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion." *Brignoni-Ponce*, 422 U.S. at 883.  But "[t]he stop and inquiry must be reasonably related in scope to the justification for their initiation." *Id.* at 881 (quotation omitted) (quoting *Terry*, 392 U.S. at 29).   Accordingly, "the officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." *Brignoni-Prince*, 422 U.S. at 881-82; *United States v. Melendez-Gonzalez*, 727 F.2d 407, 413 (5th Cir. 1984); *United States v. Hill*, 626 F.2d 429, 434 (5th Cir. 1980).

Here, Plaintiffs contend that once Vega requested to view the contents of the trunk of their vehicle, the immigration investigation that formed the basis of the initial stop concluded. [Dkt. No. 30 at 10].  This contention is without merit.  Indeed, the record shows that Vega had not concluded his investigatory immigration inspection before Rolando and Paula Gonzalez left the scene of the initial stop.  Vega testified that he performed the initial stop "[t]o make an immigration inspection on the passengers of the vehicle and the driver."  [Dkt. No. 30, Ex. A. at 156].  Vega also asserted that, during the initial stop, Rolando and Paula Gonzalez repeatedly shouted obscenities at him and that he could not focus on the contents of the trunk.  In his affidavit, Rolando Gonzalez does not dispute that he and Paula Gonzalez shouted obscenities at Vega.  Vega's testimony thus demonstrates that he was unable to conduct a satisfactory search of Plaintiffs' trunk.  Moreover, Vega stated that he did not question Paula Gonzalez about her citizenship.  [*Id.* at 167].  After Rolando Gonzalez expressed his intent to leave the scene of the initial stop, Vega testified that he stated, " '[d]on't take off cause I haven't finished my immigration inspection.  I want to talk to the lady.' "  [*Id.*].  It is undisputed that Plaintiffs

ignored this order and drove away from the scene of the initial stop.  Thereafter, Vega testified that he pursued Plaintiffs for the purpose of arresting them for their failure to yield to his order. [*Id*. at 175].  Finally, Vega testified that, after parking near Ramiro Gonzalez's residence, he asked to speak to Paula Gonzalez, asking specifically, "[w]here's the lady."  [*Id*. at 184].  It is apparent, therefore, that in calling for backup and parking two houses away from Plaintiffs' home, Vega was continuing his effort to conduct an immigration inspection.

In response, Plaintiffs have failed to provide evidence disputing the fact that Vega had yet to conclude his immigration inspection.  At best, Rolando Gonzalez alleges that "[a]t no point during [the] encounter did Agent Vega ask either me or my mother whether we were U.S. citizens or what our immigration status was."  [Dkt. No. 30, Ex. 2, ¶ 8].  While such evidence seemingly conflicts with Vega's testimony that he asked Rolando Gonzalez where he was from, it is consistent with Vega's testimony that he told Plaintiffs he wanted to speak with Paula Gonzalez.  Indeed, it is apparent that Vega never asked Paula Gonzalez about her citizenship status because he did not have an opportunity to do so.  While the parties dispute whether Vega asked Rolando Gonzalez about his citizenship, the dispute is not material.  The summary judgment evidence shows that—during the course of the initial stop—Rolando and Paula Gonzalez shouted obscenities against Vega; that Rolando Gonzalez told Vega he was going to leave the scene of the stop; that Vega ordered him not to leave because he had yet to finish his immigration inspection and he wanted to speak with Paula Gonzalez; and that Rolando Gonzalez ignored Vega's order.  It is therefore apparent that Vega's immigration inspection had not concluded.  For these reasons, the Court concludes that Vega had reasonable suspicion to call for backup and park near Plaintiffs' home; these acts therefore did not constitute violations of Plaintiff Rolando and Paula Gonzalez's rights under the Fourth Amendment.

**2.      Whether Rolando Gonzalez consented to the search of his vehicle's trunk**

Plaintiffs also assert that Vega's failure to engage in an immigration inspection and his repeated insistence that Rolando Gonzalez open the trunk so that he could inspect it for illegal immigrants raises a material issue as to both the purpose of the stop and the validity of Rolando Gonzalez's consent for Vega to search the vehicle.  [Dkt. No. 30 at 15-16].  As stated, the evidence shows that Vega attempted to conduct an immigration inspection.  The Court notes that Vega's attempt to view the contents of the trunk were congruent with his inspection; indeed, Vega testified that Plaintiffs' vehicle was "traveling low in the rear."  [Dkt. No. 29, Ex. A at 215-216].  Nonetheless, the Court must determine whether Rolando Gonzalez consented to the search of his trunk and, if not, whether Vega had probable cause to conduct a search of the trunk.

In the Fifth Circuit, six factors are pertinent in determining the voluntariness of consent, including: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found."  *Chavez-Villarreal*, 3 F.3d at 128 n.15 (citing *United States v. Richard*, 994 F.2d 244 (5th Cir. 1993)).  Here, Rolando Gonzalez alleges that, at the beginning of the initial stop, Vega explained that he was stopping Rolando Gonzalez because his vehicle was "loaded to the max with 'wet backs.'"  [Dkt. No. 30, Ex. 2, ¶ 4].  When Rolando Gonzalez asked how that could be, Vega responded that he had received anonymous calls.  *Id*.  Thereafter, Rolando Gonzalez avers that Vega ordered him in Spanish to open the trunk.  [*Id*., ¶ 5].  After Rolando Gonzalez responded by stating, "Sir, I have papers[,]" Vega allegedly stated, "I am not asking you."  [*Id*.].  When Rolando Gonzalez proffered his identification to Vega, Vega allegedly stated that Rolando Gonzalez was under

arrest.  [*Id*.].  Next, Vega allegedly showed Rolando Gonzalez a paper indicating he had proof that illegal aliens were in the vehicle and "kept grabbing his gun which was in his holster during this time."  [*Id*., ¶ 6].  At this point, Rolando Gonzalez states that "[w]e subsequently consented to the search, and I opened the car's trunk for him."  [*Id*., ¶ 7].

The Court begins this analysis with the undisputed fact that Rolando Gonzalez gave consent for Vega to search the trunk.  The issue is whether that consent was coerced.  In determining this issue, all facts and evidence must be taken in the light most favorable to the non-moving party.  *United Fire & Cas. Co. v. Hixson Bros. Inc.*, 453 F.3d 283, 285 (5th Cir. 2006).  Therefore, unless undisputed, the Court considers only the evidence presented in Rolando Gonzalez's declaration.

The first factor—the voluntariness of the defendant's custodial status—weighs in favor of Vega.  While Vega allegedly told Rolando Gonzalez that he was under arrest and Vega kept grabbing his gun, which remained notably in its holster, there is no other evidence that Rolando Gonzalez was in custody, detained, or restrained by word or deed.  The evidence establishes that Rolando Gonzalez, as well as Paula Gonzalez, voluntarily exited the car; that Rolando Gonzalez reached for his wallet; that he voluntarily displayed his identification; that he actually knew he was not under arrest or detained; that he knew he could leave; and that he in fact left despite being told that he could not do so.  At no time did Vega attempt to physically stop Rolando Gonzalez from leaving, nor was any force displayed to stop Rolando Gonzalez from leaving. The Court will address the second factor after considering the remaining four factors.  The third factor—the extent and level of defendant's cooperation—weighs in favor of Vega.  Rolando Gonzalez's declaration establishes that he cooperated fully with Vega; that he was polite and respectful; that he answered all questions and even volunteered his identification.  The fourth

factor—the defendant's awareness of his right to refuse to consent—also weighs in favor of Vega.  In his declaration, Rolando Gonzalez states that he "initially refused to open the trunk," thus making it clear that he was aware of his right to refuse.  [Dkt. No. 30, Ex. 2, ¶ 6].  The fifth factor—the defendant's education and intelligence—is a somewhat neutral factor because there is no evidence before the Court as to Rolando Gonzalez's education or intelligence other than his declaration itself.  But from the declaration, it appears that Rolando Gonzalez is at least of average intelligence; the wording of the declaration is such that Rolando appears to have some education.  Finally, the sixth factor—the defendant's belief that no incriminating evidence will be found—requires no elaboration.  This factor weighs in favor of Vega.

The only factor that weighs somewhat in favor of Rolando Gonzalez is the second factor—the presence of coercive police procedures.  The evidence here is that Vega ordered Rolando Gonzalez to open the trunk; that Vega told Rolando Gonzalez he was under arrest; and that he was shown a paper indicating aliens were in the trunk.  Were this the only factor to be considered, summary judgment would be inappropriate as it would create a material fact issue for the jury to determine.  However, the Court finds, as a matter of law, in consideration of all six factors and viewing the evidence in the light most favorable to Rolando Gonzalez, Rolando has failed to raise a fact issue as to the voluntariness of his consent.  Consequently, with regard to Rolando Gonzalez's claim as to the constitutionality of the search of the trunk, the Court **GRANTS** summary judgment in favor of Vega.

### 3.       Whether Vega illegally seized Plaintiffs

The question now before the Court is whether Plaintiffs Rolando, Paula, and Ramiro Gonzalez were illegally seized after Vega called for assistance and parked more than two houses away from Ramiro Gonzalez's home.  Plaintiffs contend that several factors led Plaintiffs to

believe that they were seized, including the number of officers who arrived in response to Vega's call for back up, the positions of the officers in relation to Plaintiffs, the fact that the officers were "fully armed[,]" and the alleged instructions for Ramiro and Rolando Gonzalez to return to their home.  [Dkt. No. 30 at 22].  With regard to Rolando and Paula Gonzalez, the Court disagrees.

<b>a.    Rolando Gonzalez</b>

As an initial matter, the mere presence of Vega and other officers near Ramiro Gonzalez's home would not lead a reasonable person to believe that he was not free to leave. *See Mask*, 330 F.3d at 338-39 (noting that "[t]here is nothing particularly coercive about police observation in public.").  The fact that the officers were positioned to observe Plaintiffs gives no indication that Plaintiffs' movements were in any way restrained.  *See id.* ("[T]he fact that one of the police officers kept an eye on [the plaintiff] did not communicate to a reasonable person that [the plaintiffs] could not leave, particularly after he had been specifically told by [an officer] that he *could* leave.").  Moreover, there is no evidence that the officers positioned themselves so as to create a perimeter around Rolando Gonzalez, or his home.  Indeed, Vega states that he parked more than two houses away from Ramiro Gonzalez's home.  [Dkt. No. 30, Ex. A at 181].  There is no evidence that the officers ever moved closer.  And contrary to Plaintiffs' contention, the fact that Agent Trejo testified that he tried "to get position around to one side where no law enforcement was at," [Dkt. No. 29, Ex. E at 40], in no way demonstrates that the officers surrounded Rolando Gonzalez.  Furthermore, Plaintiffs have provided no evidence indicating that the officers had drawn or raised their weapons.  Finally, while Rolando Gonzalez alleges that he was told he was arrested, he concedes that he subsequently returned home.  Specifically, Rolando Gonzalez states that "we were all told more than once by him and the Deputy Sheriff

that we were all under arrest, not to move. Yet, after about a while out in the hot Laredo sun, we moved into our property as advised by two Sheriff's office investigators."  [Dkt. No. 30, Ex. 2, ¶ 10].  Moreover, there is no evidence indicating that the officers used physical force or a show of authority to prevent Rolando Gonzalez from returning home, much less that Vega ordered the officers to do so.  Absent a showing of such force or authority, Rolando Gonzalez has failed to raise a fact issue that, under the totality of circumstances, a reasonable person would believe he was not free to leave.  For these reasons, the Court concludes that Plaintiffs have failed to show that Vega illegally seized Rolando Gonzalez after arriving near Plaintiffs' residence.

> **b.   Paula Gonzalez**

Next, as to the issue of whether Paula Gonzalez was illegally seized, Plaintiffs have provided no summary judgment evidence indicating that Plaintiff Paula Gonzalez was ever seized after Vega parked a few houses down from Ramiro Gonzalez's residence.  As stated, Rolando and Paula Gonzalez left the scene of the investigatory stop after Vega ordered them not to leave.  Since Rolando and Paula Gonzalez ignored this order, Plaintiffs cannot persuasively argue that she was seized at that time.  As noted by Vega, there can be no seizure without an individual's submission.   Moreover, through their affidavits, neither Ramiro nor Rolando Gonzalez have provided any testimony as to Paula Gonzalez's location during the incident near Plaintiffs' home, much less that she was seized.  As stated, Ramiro Gonzalez alleges, in rather vague and overbroad fashion, that "they continued to say that we were arrested[,]" and that "the Deputy Sheriff told us that we were all arrested."  [Dkt. No. 30, Ex. 1, ¶¶ 7, 8].  Similarly, Rolando Gonzalez merely states that "[w]e were all told more than once by him and the Deputy Sheriff that we were all under arrest, not to move."  [Dkt. No. 30, Ex. 2, ¶ 10].  Plaintiffs have therefore failed to provide any evidence indicating that Paula Gonzalez was present at the scene

of the incident, much less that she was illegally seized by Vega.  Consequently, with regard to her claim for damages under *Bivens* against Vega in his individual capacity, the Court **GRANTS** summary judgment against Plaintiff Paula Gonzalez.

        **c.**    **Ramiro Gonzalez**

        Plaintiffs' evidence establishes that Ramiro Gonzalez voluntarily left his home and approached Vega (without being prompted by Vega or any other officer to do so); that he was told he would be arrested; that Vega attempted to place him in handcuffs; and that he was told he was arrested.  In pertinent part, Ramiro Gonzalez's affidavit states that "[A]gent Vega talked with the Deputy Sheriff, and right thereafter, acting jointly with Agent Vega, the Deputy Sheriff said that I was being arrested.  The Deputy Sheriff tried to grab my arm intending to put handcuffs on me, but I told him my arm was injured."  [Dkt. No. 30, Ex. 1, ¶ 7].  Ramiro Gonzalez continues: "The Deputy Sheriff did not put the handcuffs on me, but they continued to say that we were arrested."  [*Id.*].  In summary, Ramiro Gonzalez has alleged that officers told him he was going to be arrested; that Vega ordered him to be handcuffed; that the officers attempted to handcuff him; and that he was subsequently told that he was under arrest.  While, similar to Rolando Gonzalez, Ramiro Gonzalez concedes that he was advised to return home, and thereafter returned home, the fact that Vega allegedly attempted to have him handcuffed is salient.  Under the totality of circumstances, a reasonable person would be led to believe that they were restrained in their movements or not free to leave.

        Next, assuming that Vega seized Ramiro Gonzalez, Plaintiffs have also demonstrated a material fact issue as to whether Ramiro Gonzalez's alleged arrest was motivated by probable cause.  While disputed by Vega, Ramiro Gonzalez stated that "[he] did not threaten Agent Vega at any time during the time I talked with him."  [Dkt. No. 30, Ex. 1, ¶ 8].  While it is apparent

that Plaintiffs have created a fact issue as to whether Ramiro Gonzalez threatened Vega verbally, the Court must address whether Ramiro Gonzalez gave Vega reason to fear for his personal safety through non-verbal conduct.  During his deposition, Vega testified that after he exited his vehicle near Plaintiffs' residence, "they came up to my vehicle and they almost hit me."  [Dkt. No. 30, Ex. A at 184].  While this evidence is insufficient to identity Ramiro Gonzalez as the individual who "almost hit [Vega]," it is also an ambiguous description of Plaintiffs' alleged physical movements.  The testimony of other officers also fails to demonstrate whether Ramiro Gonzalez indeed conducted himself in such a way as to give Vega or other officers reason to fear for their safety.  Vega directs the Court to the testimony of Agent Garza, but while Agent Garza testified that "[I] saw folks, several individuals out there, males and a female out there, an older female[;]" that "[t]hey were all yelling, pointing and charging at Mr. Vega[;]" and that "some were surrounding his vehicle[,]" this evidence fails to show whether Ramiro Gonzalez specifically charged Vega.  [Dkt. No. 29, Ex. D at 23].  Moreover, Agent Trejo merely stated that he observed "the gentleman who was in front of [Vega]" shout at Vega, point at Vega, and use hand gestures.  [Dkt. No. 29, Ex. E at 41-42].  Because Ramiro Gonzalez has created a fact issue as to whether he was seized, and also as to whether Vega had probable cause to arrest him, the Court cannot conclude that Vega did not violate Ramiro Gonzalez's right to be free from an illegal seizure.  For this reason, Vega's motion for summary judgment against Ramiro Gonzalez is **DENIED**.

## III.    CONCLUSION

For the reasons stated, the Court concludes that Plaintiffs have failed to raise a material issue of fact as to whether Vega violated the constitutional rights of Rolando and Paula Gonzalez under the Fourth Amendment.  Consequently, the Court **GRANTS** Vega's Motion for Summary

Judgment as to the *Bivens* claims of these two Plaintiffs. [Dkt. No. 29]. But Plaintiff Ramiro Gonzalez has demonstrated a material fact issue as to whether Vega unconstitutionally seized him. Consequently, the Court **DENIES** Vega's Motion for Summary Judgment as to Ramiro Gonzalez's *Bivens* claim.

IT IS SO ORDERED.

DONE this 2nd day of July, 2009, in Laredo, Texas.

_____
Micaela Alvarez
UNITED STATES DISTRICT JUDGE

**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.**